IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR338 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| TEODORO OZUNA BERNAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the objection, Filing No. 31, to the findings and recommendation ("F&R") of the magistrate judge, Filing No. 30. The magistrate judge recommended denial of the defendant's motion to suppress, Filing No. 19. The defendant was charged in a three-count indictment with knowingly using identification documents that were not lawfully issued to him for the sole purpose of satisfying a requirement of an employment verification system, for making a false claim of United States citizenship, and for making a false representation of a Social Security number not assigned to him with the intent to deceive. Filing No. 1.

The defendant has filed a motion to suppress all evidence. *See* Filing No. 19. Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a *de novo* determination of those portions of the F&R to which the defendant objects. *United States v. Lothridge,* 324 F. 3d 599, 600-01 (8th Cir. 2003). The court has reviewed the record including the exhibits and the transcript of the hearing on the motion to suppress held on December 1, 2010. Filing No. 29. Additionally, this court has already addressed the identical issues in this case in *United States v. Gomez-De La Cruz,* 2011 WL 884985 (D. Neb. March 11, 2011) and finds the same analysis applies here.

## BACKGROUND

The court adopts the factual findings of the magistrate judge, and these findings need not be fully repeated here.  In March of 2007, the Federal Trade Commissioner ("FTC") received a complaint on behalf of a Jose Valin Lopez of Lubbock, Texas, regarding identity theft.  Filing No. 29, Tr. at 4.  A member of the FTC found that Lopez's Social Security number was being used by someone in Omaha, Nebraska.  *Id.* at 4.  In April 2010, Immigration Customs Office ("ICE") verified the FTC complaints and found that the I-9 form was being used by someone working at Omaha Steaks.  *Id.* at 4-5.  On April 30, 2010, the Omaha ICE office conducted an audit of I-9 forms at Omaha Steaks in Omaha, Nebraska.  Tr. at 3-4.  The audit determined that there were fourteen people employed at Omaha Steaks who are on the FTC list of complaints of identity theft.  Tr. at 4.

On September 7, 2010, fifteen ICE Special Agents went to Omaha Steaks to interview fourteen employees of Omaha Steaks who are allegedly involved in identity theft.  Tr. at 5.  The ICE agents were casually dressed and were also armed.  *Id.* at 5.  ICE agents requested that the managements of Omaha Steaks isolate the alleged offenders in a training room.  Tr. at 6.

Special Agent Andrew Stewart was assigned to the defendant, Teodoro Ozuna Bernal.  When Agent Stewart called out the name of Jose Valin Lopez, the defendant answered.  Tr. at 6-7.  Agent Stewart proceeded to ask the defendant questions such as his name, where he was born, and if he was authorized to work in the United States.  Tr. at 7-8.  The defendant responded to Agent Stewart that his name is Jose Valin Lopez and that he was born in Laredo, Texas.  Tr. at 8.  Agent Stewart then asked the defendant to produce documents authorizing him to work in the United States, but the defendant could

2

not produce these documents.  Tr. at 7-8.  Agent Stewart then placed the defendant under administrative arrest, placed him in handcuffs, and moved him to another part of the room where the defendant's person was searched incident to arrest.  Tr. at 8.  Agent Stewart discovered a Mexican Consulate identification in the name of Teodoro Ozuna Bernal in the defendant's wallet during the search.  Tr. at 9. The defendant and other detainees were then transported to the ICE district office in Omaha for processing.  *Id.* at 9.  The defendant was fingerprinted, which was then uploaded to both the FBI database and ICE IDENT system.  Tr. at 10-11.  The FBI database did not produce any criminal history for the defendant.  Tr. at 11.  However, the defendant's fingerprints matched that of Teodoro Ozuna Bernal.  *Id.* at 11.  The defendant was then given a *Miranda* warning in Spanish.  Tr. at 10.  Thereafter, the defendant exercised his rights to remain silent.  *Id.* at 10.

The magistrate judge found that a *Miranda*  warning was not required for the biographical or routine booking questions even if the information turned out to be incriminating.  He further found that the ICE agents did not seize the defendant and the other individuals when the ICE agents requested that Omaha Steaks place the suspects in an isolated room.  *Id.* at 4.  In addition, he found that the ICE agents had authority to interrogate any suspected alien's right to be in the United States.  The magistrate judge also found that because the ICE agents had notice that someone at Omaha Steaks was using Jose Valin Lopez's name and Social Security number from the 2007 FTC complaint, the ICE agents had probable cause to administratively arrest the defendant when he gave a false name and was unable to produce any documents authorizing him to work in the United States.

The defendant objects to the magistrate judge's F&R and argues that all evidence derived from his unlawful detention and arrest and all statements made to ICE agents should be suppressed because he was not advised of his rights under *Miranda* prior to the questioning.  He further contends that the FTC reports could not serve as a basis for reasonable suspicion because those reports are stale.

### DISCUSSION

#### A.  Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   "The simple language of the Amendment applies equally to seizures of persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 584 (1980). The "Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Horton v. California*, 496 U.S. 128, 133 n.4 (1990) (citations omitted).  It applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Davis v. Mississippi*, 394 U.S. 721 (1969); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968) (stating "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'").

4

There are three categories of police encounters: (1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144-45 (8th Cir. 2007) ("*Flores-Sandoval II*"); *see generally* Terry, 392 U.S. at 16-20 (1968).

In a consensual encounter, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)); *see also* INS v. Delgado, 466 U.S. 210, 216 (1984). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)); *accord* United States v. Drayton, 536 U.S. at 201(2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."). However, "[a]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Delgado*, 466 U.S. at 215 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *Flores-Sandoval II*, 474 F.3d at 1145 (stating that "a consensual encounter becomes a seizure implicating the Fourth Amendment when,

5

considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave").

Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. *Delgado*, 466 U.S. at 216. The systematic questioning of employees at a workplace is not a seizure because "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers" and "most workers could have had no reasonable fear that they would be detained upon leaving." *Id.* at 218-19.

Under the Fourth Amendment, when officers have no basis for suspecting a particular individual, they may generally ask questions of the individual and ask to examine the individual's identification. *Id.* at 216; *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004). Police may not, however, convey a message that compliance with their requests is required. *Bostick*, 501 U.S. at 435.

Immigration officers are authorized, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States . . . " and "to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any [law or regulation involving the admission, exclusion, expulsion or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(1) & (2); *United States v. Quintana*, 623 F.3d 1237, 1240 (8th Cir. 2010). Immigration officers also have the power, without a warrant, to make arrests

for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony, if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(a)(5)(B); *see* 8 C.F.R. 287.5(c)(4). The authority granted to immigration officers is not unbounded, but is subject to the principles of the Fourth Amendment as it relates to searches and seizure. *United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985); *Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) (noting that the Fourth Amendment provides protection against random or gratuitous questioning related to an individual's immigration status).

Under the interrogation component of the statute, immigration officers "may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country." *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C. Cir. 1971) (applying *Terry* standards).  A plain reading of 8 U.S.C. § 1357 (a)(1) requires the government to show that immigration officials believe that a person is an alien before questioning him. *Flores-Sandoval I*, 422 F.3d at 714 (8th Cir. 2005); *see also* 8 C.F.R. § 287.8(b)(2) (an immigration official may briefly detain a person for questioning if he "has a reasonable suspicion, based on specific articulable facts, that the person being questioned is engaged in an offense against the United States or is an alien illegally in the United States").

Immigration authorities may not detain persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens. *United States v.*

*Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (rejecting the argument that a person's apparent Mexican ancestry alone justifies belief that he or she is an alien and satisfies the requirement of the statute allowing interrogation and arrests of aliens).   Also, law enforcement officers may question a driver and passengers about citizenship and immigration status in a random traffic stop only at, or within close proximity to, the border. *Id.* at 882.  Even after such a stop, any further detention or search must be based on either consent or probable cause.  *Id.*

"Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." *Quintana*, 623 F.3d at 1240.  Regulations promulgated under that statute provide that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."  8 C.F.R. § 287.8(c)(2)(ii) (emphasis added). The regulations further provide that "[a]t the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) State that the person is under arrest and the reason for the arrest."  8 C.F.R. § 287.8(c)(2)(iii).

An alien present in this country who was inadmissible when he entered is deportable. *Quintana*, 623 F.3d at 1240.  "'A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime.'"  *Id.* (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)).  Immigration law is generally regulatory rather than criminal and deportation hearings are civil proceedings.  *Lopez-Mendoza*, 468

U.S. at 1038; *United States v. Perez-Perez*, 337 F.3d 990, 997 (8th Cir. 2003) ("Civil deportation proceedings do not trigger the criminal rules of procedure"). The exclusionary rule does not apply to civil deportation proceedings, in part because "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." *Lopez-Mendoza,* 468 U.S. at 1044-45 (noting that "[t]o safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices" and the "regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof.").

The regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations of the immigration laws. *Quintana*, 623 F.3d at 1240 & n.1 (noting that the regulations require that when a person is "arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law," and must take the defendant without unnecessary delay before a magistrate judge or other appropriate judicial officer, whereas "[b]ecause arrests under § 1357(a)(2) for the purpose of deporting an illegal alien result in 'civil' or 'administrative' removal proceedings, aliens held in that type of custody are not entitled to the protections of Rule 5(a) of the Federal Rules of Criminal Procedure [providing for appearance before a magistrate]").

### *B. Fifth Amendment*

Under *Miranda v. Arizona*, 384 U.S. 436, 484 (1966), certain warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement

officials. *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). Interrogation occurs when an officer's interaction with the suspect is "likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Interrogation includes not only express questioning by an officer, but also any words or actions that "police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th 2010). However, asking a routine booking question is not interrogation under *Miranda*. *Id.* (noting that "[a] request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating). Judicial scrutiny is not necessary unless an agent "should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged." *Id.* When officers have no basis for suspecting a particular individual, they may generally ask questions of the individual and ask to examine the individual's identification. *INS v. Delgado*, 466 U.S. 210, 216 (1984); *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004). Police may not, however, convey a message that compliance with their requests is required. *Florida v. Bostick*, 501 U.S. 429, 435 (1991).

"*Miranda* defines custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Hogan*, 539 F.3d 916, 922 (8th Cir. 2008) (quoting *Miranda,* 384 U.S. at 444). Police officers are not required to administer *Miranda* warnings to everyone whom they question; the protections of *Miranda* apply to custodial interrogations. *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). An individual is in custody when "a reasonable person in his position would

consider his freedom of movement restricted to the degree associated with formal arrest."
*Flores-Sandoval II*, 474 F.3d at 1146.

To determine whether a defendant is "in custody" for *Miranda* purposes, the court considers the "totality of the circumstances" confronting the defendant at the time of the interview. *Id.* The court's "focus during this inquiry is on 'objective circumstances, not on subjective views of the participants.'" *United States v. Muhlenbruch, — F.3d —, —, 2011 WL 536493* at *3 (quoting *Flores-Sandoval II*, 474 F.3d at 1146). The court considers six factors in determining whether an individual is in custody for the purposes of *Miranda*: (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990). These factors are not exclusive; custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir.2004). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is expressly advising the suspect that he is not under arrest and that his participation in questioning is voluntary. *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005) (quoting *Griffin*, 922 F.2d at 1349).

Not all government inquiries to a suspect in custody, however, amount to interrogation. *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). Interrogation for *Miranda* purposes refers to any questioning or conduct that the

11

government officer should know is reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010). Interrogation is not limited to "express questioning," it also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301; *United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005).

Generally, asking a routine booking question is not interrogation under *Miranda*. *Id.* (noting that a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating); *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (exempting questions to secure the biographical data necessary to complete booking or pretrial services from *Miranda's* coverage). Permissible questions include those that "appear reasonably related to the police's administrative concerns." *Muniz*, 496 U.S. at 602; *United States v. McLean*, 409 F.3d 492, 498 (1st Cir. 2005) (the booking exception "allows police officers to ask general background questions (name, date of birth, etc.) while processing a newly arrested individual without advising him of his *Miranda* rights."). When the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, however, the questioning is subject to scrutiny under *Miranda*. *Ochoa-Gonzalez*, 598 F.3d at 1033 (finding suppression of the defendant's name was not required because the defendant's name was never in doubt and was not directly relevant to the substantive offense in the case); *accord United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)

12

(finding a defendant's name wholly incidental to his arrest for a drug crime).  The "booking exception" to *Miranda* does not mean that any question asked during the booking process falls within that exception—without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.  *Muniz*, 496 U.S. at 602 n.14;  *United States v. Scott*, 270 F.3d 30, 44 n.8 (1st Cir. 2001) (stating "[c]ases in which law enforcement officers have reason to know that routine booking questions may indeed produce inculpatory responses, however, form an exception to the exception");  *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (involving questions about a suspect's true name "for the direct and admitted purpose of linking [the suspect] to his incriminating immigration file").

Also, to be covered by the Fifth Amendment and protected by *Miranda*'s exclusionary rule, the statement must be incriminating.  *Hiibel* 542 U.S. at 189 (involving the validity of a state's "stop and identify" statute, in the context of a valid *Terry*-type stop, under the Fifth Amendment).  The Fifth Amendment does not prohibit the compelled disclosure of an individual's name "absent a reasonable belief that the disclosure would tend to incriminate him."  *Id.* at 191.  The "Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'"  *Id.* at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)).  "Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances."  *Id.* at 191 (noting that "[i]n every criminal case, it is known and must be known who has been arrested and who is

being tried," and "[e]ven witnesses who plan to invoke the Fifth Amendment privilege answer when their names are called to take the stand.").

The Supreme Court acknowledges, however, that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense," and "the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow." *Id.* Although it may be "a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*," there are situations where asking a person's name "might reasonably be expected to elicit an incriminating response," for example in an "arrest for impersonating a law enforcement officer or for some comparable offense focused on identity." *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) (noting that "[i]n such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned."); *see also Ochoa-Gonzalez*, 598 F.3d at 1039 (finding that inquiry as to name was routine information where the defendant's name was never in doubt and was not directly relevant to the substantive offense); *Brown*, 101 F.3d at 1274 (finding a defendant's name was not relevant to his arrest for a drug crime). Under the regulations promulgated under 8 U.S.C. § 1357, with respect to persons arrested and charged with criminal violations, the arresting immigration officer is required to "advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable" and to "assure that the warnings are given in a language the subject understands." 8 C.F.R. § 287.8(c)(2)(v). The subject

14

must acknowledge that the warnings are understood and the officer must document the fact. *Id.* In contrast, an alien arrested and charged administratively is to be advised of the reason as for his or her arrest and the right to counsel at government expense, as well as the fact that statements may be used against him,

If a seizure is unreasonable, "evidence obtained as a direct result" of that seizure, and evidence "later discovered and found to be derivative of an illegality or fruit of the poisonous tree," must be excluded. *Segura v. United States*, 468 U.S. 796, 804 (1984). Further, statements that result from an illegal detention are inadmissible. *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005) ("*Flores-Sandoval I*"). Fingerprints obtained by exploiting an unlawful detention, and under circumstances that are not sufficient to have purged the taint of the initial illegality, are also subject to application of the exclusionary rule. *United States v. Guevara-Martinez*, 262 F.3d 751, 756-57 (8th Cir. 2001) (noting that "[t]he absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting" counseled in favor of applying the exclusionary rule); *see also Flores-Sandoval I*, 422 F.3d at 715 (suppressing fingerprint evidence, noting absence of consent to the taking of fingerprints and finding it "unlikely that [the defendant] felt free to decline [an immigration officer's] request for fingerprints and terminate the encounter.").[1] Evidence

---

[1]The Eighth Circuit Court of Appeals noted in that case that suppression would be of little value to the defendant since ICE could issue a detainer to retake custody of the defendant "because, as a jurisdictional rather than an evidentiary matter, his body and identity cannot be suppressed as fruit of the poisonous tree." *Flores-Sandoval I*, 422 F.3d at 715. The court commented that "ICE will likely obtain a new set of fingerprints from [the defendant] for civil deportation proceedings, and the government may recharge him with illegal re-entry after deportation" and stated that, though the result had "a somewhat academic feel to it," the court found that "reminding the government that it must do things 'the right way'" served an important interest. *Id.* (quoting *Guevara-Martinez*, 262 F.3d at 756).

obtained as a result of a constitutional violation may still be admissible if the later discovery is significantly attenuated from the primary violation, if the later discovery was inevitable, or if the later discovery was supported by an independent, taint-free source. *United States v. Villa-Gonzalez*, 623 F. 3d 526, 534 n.7 (8th Cir. 2010).  "[T]he public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984).

### C. Analysis

This court has already ruled in *Gomez-De La Cruz* that the FTC complaints were not so stale that they could not be considered as a reasonable grounds for suspicion. That same determination applies here. The court also finds that the facts in *Gomez-De La Cruz* are substantially similar in this case. They both arose out of the same investigative detention. The issues are substantially identical. For this reason, the court finds the analysis set forth in *Gomez-De La Cruz* is dispositive of all the issues in this case. The magistrate judge's F&R overlooks the important distinctions between detention and administrative arrest of a suspected alien for deportation and detention and arrest for a criminal offense. The increasing practice of subjecting aliens to criminal prosecution rather than deportation creates a different paradigm for immigration cases.

The record in this case shows that immigration officers were investigating identity theft crimes from the outset, and not immigration offenses. Because the encounter at the defendant's workplace fell within the range of a criminal investigation, the defendant was entitled to Fourth and Fifth Amendment protections that he will not get in civil cases. Pursuant to *INS v. Delgado*, this was not the type of systematic questioning that relates to

16

a consensual encounter. The defendant was specifically targeted and interrogated for a serious crime. ICE agents testified that they suspected the defendant was involved in identity theft. The ICE agents knew that the information they sought was directly relevant to the substantive offense they were investigating; therefore, such information was not in the nature of identity in an ordinary case. The encounter between the defendant and the ICE agents was not a consensual encounter because the defendant was not free to terminate the encounter. Further, the government's reliance on 8 U.S.C. § 1357 as an authority for the warrantless arrest is without merit. The statute and the regulations promulgated thereunder contemplates the issuance of an arrest warrant unless there is reason to believe that the person is likely to escape before a warrant can be obtained.

This court finds that the defendant was in custody when he was interrogated by the ICE agents. Notably, the question went beyond asking for identification. Factors relevant to custody determination weigh in favor of custody, because no reasonable person in the defendant's position would believe he was free to terminate the interrogation and leave the room. The defendant was not told that he was under arrest or free to leave. The defendant did not have freedom of movement because Agent Stewart testified that the defendant would have been detained if he tried to leave. The defendant did not initiate the contact with the ICE agents, and he did not have a choice but to submit to the demands of his employer. The atmosphere of the interrogation room was police-dominated even though there is no evidence of strong-arm tactics or deceptive strategies. Approximately fifteen ICE agents were present in the interview room and all of them were armed. ICE agents bought transport vehicles with them, and shortly after the conclusion of the interview, the defendant was placed under arrest and was transported with the other

detainees to the ICE district office in Omaha for processing.  The defendant should have been provided a *Miranda* warning at the time he was first questioned by Agent Stewart because Agent Stewart knew that his response would lead to an incriminating response. The court finds the defendant's objections to the F&R of the magistrate judge should be sustained and the defendant's motion to suppress should be granted as set forth herein and in *Claudia Gomez-De La Cruz.*  Accordingly,

IT IS HEREBY ORDERED:

1.   The defendant's objection to the magistrate judge's F&R, Filing No. 31, is sustained in part, in accordance with this Memorandum and Order.

2.   The F&R of the magistrate judge, Filing No. 30, is adopted in part and rejected in part in accordance with this Memorandum and Order.

3.   The defendant's motion to suppress, Filing No. 19, is sustained with respect to his statements but denied in all other respects.

DATED this 23rd day of March, 2011.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

18